# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

DAVID VAN ELZEN, on behalf of himself and
all others similarly situated,

        Plaintiff,

        v.                             Case No. 24-C-1206

AMERICAN HOME SHIELD CORPORATION,

        Defendant.

---

## DECISION AND ORDER GRANTING
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

Plaintiff David Van Elzen filed this action on behalf of himself and all others similarly situated against Defendant American Home Shield Corporation (AHS), alleging violations of the Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227. Plaintiff alleges that even though he listed his phone on the National Do Not Call Registry, AHS contacted him via text message regarding a home warranty on four separate occasions in violation of the TCPA. AHS admits that it sent text messages to Plaintiff's phone but claims it had his express consent to do so. This court has jurisdiction pursuant to 28 U.S.C. § 1331 because the claim arises under a federal statute. This case is currently before the court on AHS's motion for summary judgment. For the reasons that follow, AHS's motion will be granted.

## BACKGROUND

The TCPA was enacted in 1991 in response to numerous consumer complaints about the frequent unsolicited and intrusive telephone calls to their homes by telemarketers. *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 616 (2020). The TCPA directed the Federal

Communications Commission (FCC) to "initiate a rulemaking proceeding concerning the need to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object." 47 U.S.C. § 227(c)(1). One of the regulations promulgated by the FCC prohibits telephone solicitations to residential telephone subscribers who have listed their phone numbers on the National Do Not Call (DNC) Registry. 47 C.F.R. § 64.1200(c)(2). As relevant here, the TCPA creates a private right of action for a person who receives more than one telephone call within a twelve-month period in violation of the FCC regulation in the absence of the person's express consent. *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 372 (2012); 47 U.S.C. § 227(b)(3), (c)(5). There is no liability under the TCPA, however, if the person or entity making the solicitation "has obtained the subscriber's prior express invitation or permission." *Id.* § 64.12000(c)(2)(ii). Text messages to cellular phones constitute "calls" within the meaning of the TCPA. *Blow v. Bijora, Inc.*, 855 F.3d 793, 798 (7th Cir. 2017); 47 U.S.C. § 227(b)(1)(A)(iii). It is this regulation that Plaintiff claims AHS violated. He denies that he gave consent to receive text messages from AHS.

The incentive for a person to file an individual action under the TCPA, or for that matter to defend one, is generally not great, considering the high cost of litigation. Other than an injunction enjoining future violations, an individual can recover only the actual monetary loss (usually none) or $500 in statutory damages for each violation, whichever is greater. 47 U.S.C. § 227(b)(3). Damages can be trebled if the court finds that the violation was willful or knowing, *id.*, but actual attorneys' fees are not available. *See Holtzman v. Turza*, 828 F.3d 606, 608 (7th Cir. 2016) ("The Telephone Consumer Protection Act is not a fee-shifting statute.").

The incentive structure changes dramatically, however, when, as here, the case is brought as a class action under Fed. R. Civ. P. 23. Total damage awards in TCPA class action lawsuits,

2

out of which the plaintiff's attorney would receive a third under the typical contingency fee agreement, can amount to millions, or even a billion, dollars. *See, e.g.*, *Blow*, 855 F.3d at 797 (noting that on behalf of the class, plaintiff claimed over $1.8 billion in statutory damages, including treble damages); *Wakefield v. ViSalus, Inc.*, 51 F.4th 1109, 1113 (9th Cir. 2022) (vacating jury award in TCPA class action of $925,220,000 as violative of substantive due process); *In re Capital One Tel. Consumer Prot. Act Litig.*, 80 F. Supp. 3d 781, 809 (N.D. Ill. 2015) (approving settlement of TCPA MDL Class Action for $75,455,099, out of which five named plaintiffs were to receive $5,000 and Class Counsel $15,668,265); *see also* Alex Dougherty Neumann, *Sticker Shock Due Process*, 75 DUKE L.J. 337, 337 (2025) (noting that "in the digital age, where automated technologies can generate millions of violations without human oversight, courts are now confronting monstrous aggregate awards composed of small individual violations performed by machines and artificial intelligence"). As Judge Holderman noted in *Capital One*, "[t]hat type of potentially bankruptcy-level exposure [in TCPA class actions] is sufficient to compel an *in terrorem* settlement before a liability determination is made . . . ." 80 F. Supp. 3d at 805.

It is against this backdrop that the issues in this case arise. Plaintiff alleges that he registered his cell phone number on the National DNC list in June 2011. Compl. ¶ 19, Dkt. No. 1. He denies that he ever consented to receive texts from AHS and further contends that he is a renter and would have no reason to visit a home warranty website or request information about home warranties. He also points out that his name is misspelled in the email address AHS claims he provided. Nevertheless, on August 24, 2024, Plaintiff received a text message to his phone from an AHS representative thanking him for requesting information about AHS's home warranties. The message stated that a member of "our team" would be calling him but that if he wished to

3

schedule a call when he was available, he could do so by texting or calling AHS at the number provided. At the end of the text was the instruction: "Reply 'Remove' to opt out." *Id.* ¶ 24. Plaintiff apparently did not opt out and received a similar text message from AHS on August 27, 2024, stating they had time to talk to him that week when he was ready to learn more about AHS warranties, and a third on August 28, 2024, asking him if he was still interested. *Id.* ¶¶ 30–31. Plaintiff received a fourth text message from AHS stating, "[Y]ou filled out an online form requesting more info and said we could text you," and asking, "Is it still OK to contact you here?" The message continued, "Text 'Yes' to be connected to an agent now. Text 'remove' to Opt-Out." *Id.* ¶ 32. The complaint alleges that Plaintiff's attorneys sent AHS a "demand for consent" on August 28, 2024, but never received a response. *Id.* ¶ 37. In any event, Plaintiff received no further messages from AHS thereafter. Suit was filed on September 22, 2024, less than a month later.

AHS claims that Plaintiff, whom it characterizes as "a frequent filer of TCPA lawsuits," expressly consented to AHS contacting him by text messages and, in effect, accuses him of manufacturing this lawsuit for personal gain. AHS contends that it only contacted Plaintiff in response to a request to be contacted, made through an online form that was filled out with his contact information; that the extensive discovery AHS conducted in the case establishes that Plaintiff took his laptop computer to an IT professional shortly before filing his lawsuit; and that the forensic analysis of his computer that AHS paid to have performed revealed that records of his website visits were deleted, and that some of the records that the forensic analyst was able to recover showed that around the same time the online form requesting AHS to contact him was submitted, Plaintiff was visiting similar types of websites offering information on home-related products and services.

In support of these contentions, AHS first notes that Plaintiff has filed twelve other complaints against other companies alleging violations of the TCPA—the first in 2012 and at least eleven others since 2016.  Loose Decl., Exs. A–L, Dkt. Nos. 39-1–39-12.  Six of those cases were in the Eastern District of Wisconsin, two were in the Southern District of New York, and the others were in the Western District of Washington, the Northern District of California, the Southern District of Florida, and the Middle District of Florida.  All appear to have been resolved by settlements.

Despite his extensive litigation experience and familiarity with the discovery process, AHS notes that Plaintiff resisted AHS's efforts to obtain basic discovery about his browsing history.  Plaintiff's browsing history was clearly relevant in light of the fact that AHS's defense was that it received Plaintiff's name, address, and phone number via an online submission on AHS's website, which requested to be contacted with more information about AHS's home warranty products.  Plaintiff insisted he had never made such a request, yet he opposed AHS's request to view his relevant browser history on the two devices (his cell phone and home computer) he used to access the internet during the relevant time period.  Dkt. No. 18 at 1.  After extensive efforts, the two devices were inspected by a third-party expert, using a mutually agreed-upon protocol that included search terms relevant to the case.  Dkt. No. 25.  After counsel for Plaintiff withheld the bulk of the search results, AHS filed a motion to compel, which the court granted.  Dkt. No. 29.

According to Michael Perry, the forensic analyst who examined the devices, his inspection revealed a web visit to myhomequote.com on August 19, 2024.  Perry Decl., Ex. C at 2, Dkt. No. 41-3.  Perry's inspection also revealed that items associated with the internet browsing history had been deleted from the laptop on or around September 16, 2024, the same day Plaintiff took his laptop to a local IT vendor.  Perry Decl., ¶ 11, Dkt. No. 41; Loose Decl., Ex. P, Van Elzen Dep. at

5

91:07–09, Dkt. No. 39-16. Some of the deleted items were recoverable because they had been moved to, but not yet permanently purged from, the Windows Recycle Bin. Perry noted that "the Recycle Bin functions as a staging area for deletions." Perry Decl., ¶ 13. He explained that when a user deletes a file through standard means, the file is first moved to the Recycle Bin. The data remains recoverable so long as the Recycle Bin has not been emptied or overridden by subsequent activity. This was why some of the information was recoverable. *Id.* But when a user completes "double deletions" by moving files to the recycle bin and then emptying the recycle bin, the underlying records are likely unrecoverable. *Id.* ¶ 14.

Perry's analysis of the deleted items located spreadsheets in the Recycle Bin that reflected web activity from August 2024, which included visits to websites such as homebuddy.com. *Id.* ¶ 12. Both myhomequote.com and homebuddy.com are websites that offer home improvement products and services of a similar nature as AHS provides and invite visitors to provide their name, email address, and telephone number and consent to receive text and telephone calls from vendors as a condition of receiving an estimate. Loose Decl., Exs. Q and R, Dkt. Nos. 39-17 & 39-18. Moreover, the myhomequote.com website lists AHS among its partners. Van Elzen Dep. at 105:03–06:08. AHS notes that this browsing history shows "visits to third-party lead-generation sites in August 2024 that are consistent with a consumer path that could have directed a user to AHS's site." Br. in Supp. of Mot. for S.J. at 7–8, Dkt. No. 38.

When asked about these websites, Plaintiff testified that he did not recall visiting them and stated, if he did, it would have been by accident. Van Elzen Dep. at 102:02–05:14, 107:19. He testified that he took his laptop to a local IT vender on September 16, 2024, six days before the complaint was filed, to obtain his internet browsing history for the period in question. *Id.* at 91:13–16. He denied knowledge of how or why internet history files were deleted to the recycle bin but

6

speculated that if anyone created the files it would have been the IT vender. When the IT vender was deposed, however, he denied creating or deleting any files and testified that he essentially provided Plaintiff information about how to access his internet history in connection with his lawsuit. Loose Decl., Ex. S, Reyes Dep. at 17:15–23:06, Dkt. No. 39-19.

AHS, for its part, contends that it received Plaintiff's contact information from the submission of an online form requesting a home warranty quote on AHS's website. More specifically, AHS states that on or about August 24, 2024, someone navigated to a warranty comparison website that ranked different home warranties and allowed visitors to click on the ranked companies' websites. The person proceeded to AHS's website and submitted an online form listing Plaintiff's contact information and requesting information about home warranties. The following language appears directly above the button that must be clicked in order to submit the request:

> You are requesting information from AHS regarding our products and services. By clicking the button below, you consent to receive email at the email address you provided, as well as prerecorded messages, auto-dialed phone calls and text messages at the phone number you provided. You understand that your consent is not a condition of purchase. View privacy policy.

Hoffman Decl., ¶ 19, Dkt. No. 40. The phrase "privacy policy" is hyperlinked so that, if clicked on, the viewer is taken to AHS's privacy policy, which explains how AHS agrees to use the information provided.

AHS's internal call log shows that after receiving the request for information along with Plaintiff's contact information on August 24, 2024, AHS first sent the text message described above. Plaintiff apparently did not "opt out," so AHS placed a call to the number provided on August 26, 2024. AHS did not speak with Plaintiff but received an outgoing voicemail message that identified the phone as belonging to "Dave Van Elzen," which matched the identity of the

7

individual who submitted the online form. AHS sent the three follow-up text messages but ceased contact after the law firm that has represented him in ten other TCPA cases contacted AHS and asked that Plaintiff not be contacted. AHS then placed Plaintiff's name on its own DNC list and has not contacted him since.

AHS maintains written policies and procedures designed to ensure compliance with the TCPA and has implemented steps to prevent telephone solicitations that violate the TCPA. Its Telemarketing Do-Not-Call Policy applies to all AHS employees and its subsidiary companies, as well as any company with whom AHS does business. *Id.* ¶¶ 9, 14, Ex. A, Dkt. No. 40-1. AHS does not make "cold calls" to people who have not already expressed an interest in its products. Its policies and procedures are intended to ensure that it only uses telephone numbers for which it has prior express consent. *Id.* ¶ 5. AHS also maintains a policy prohibiting employees from contacting individuals who have requested not to receive marketing calls. *Id.* ¶ 9. AHS utilizes Clickpoint lead management system, a sophisticated software that blocks calls to any number on AHS's internal DNC lists and restricts calls to permissible times of day. Employees are required to log "call outcomes" to indicate a "Do Not Call" disposition when recipients so instruct. *Id.* ¶¶ 10–12. Further, AHS requires employees to undergo training on AHS policies, procedures, software, and the relevant DNC requirements, and third-party contractors are contractually bound to comply with the TCPA's requirements. *Id.* ¶¶ 13–14. AHS's database of DNC numbers is regularly updated from logs of disposition entries, and AHS purchased access to the National DNC Registry from July 2024 through July 2025. *Id.* ¶¶ 15–16.

The foregoing facts are essentially undisputed. In his opposition to AHS's motion, Plaintiff contends that AHS did not comply with the local rules for the Eastern District of Wisconsin because it did not file a statement of proposed material fact of short, numbered paragraphs, each

8

containing a single material fact supported by specific citations to the record. But at the scheduling conference, the court specifically authorized AHS to opt out of the procedure set forth in Civil L. R. 56(b)(1) and instead utilize the undersigned's "streamlined summary judgment procedure" described at the district's website. *See* Dkt. No. 12; *Preferred Procedures and General Information for Litigants Appearing Before Judge William C. Griesbach* (July 2025), https://www.wied.uscourts.gov/judges/william-c-griesbach. Plaintiff also objects to AHS's "improper attacks on his credibility and notes that the Court may not make credibility determinations at the summary judgment stage." Pl.'s Br. in Opp. at 3–4, Dkt. No. 45. Finally, Plaintiff reasserts that he did not click any button on AHS's website, never visited AHS's website, never submitted his contact information to AHS, and never requested information about home warranties from AHS, and that neither Plaintiff nor his IT vender deleted any portion of his browser history. *Id.* at 26. Plaintiff also notes that the analysis of his computer revealed no evidence that he ever visited AHS's website or that he ever deleted any portion of his browser history. *Id.*

## LEGAL STANDARD

Summary judgment is appropriate when the moving party shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In deciding a motion for summary judgment, the court must view the evidence and make all reasonable inferences in the light most favorable to the non-moving party. *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018) (citing *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017)). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). "The nonmoving party must do more than simply show that there is some

9

metaphysical doubt as to the material facts." *Id.* Summary judgment is properly entered against a party "who fails to make a showing to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Austin v. Walgreen Co.*, 885 F.3d 1085, 1087–88 (7th Cir. 2018) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

## ANALYSIS

AHS argues that it is entitled to summary judgment on two separate grounds: (1) the undisputed evidence establishes that Plaintiff expressly consented to receive text messages; and (2) even if AHS did not have Plaintiff's consent, AHS's policies satisfy a safe harbor provision under the regulations.

### A. Consent

Under the TCPA, a company may contact an individual via text messages if it obtains the individual's "prior express consent." *See Blow*, 855 F.3d at 803 ("[T]he TCPA's prohibition on using an autodialer applies only 'absent the express consent' of the recipient."); 47 U.S.C. § 227(b)(1)(A)(iii); *see also In re Rules & Regs Implementing the TCPA*, 7 FCC Rcd. 8752, 8769 ¶ 29 (1992) ("The TCPA allows autodialed and prerecorded message calls if the called party expressly consents to their use."). "Express consent is an affirmative defense on which the defendant bears the burden of proof." *Blow*, 855 F.3d at 803 (citing *In re Rules & Reguls. Implementing the TCPA*, 23 FCC Rcd. 559, 565 (2008)).

As a preliminary matter, Plaintiff argues that even if he submitted his contact information on AHS's online form, AHS would still be liable because the FCC implementing regulations require a "signed, written agreement." Pl.'s Br. in Opp. at 33 (citing 47 C.F.R. § 64.1200(c)(2)); *see also* 47 C.F.R. § 64.1200(a)(2). Under the E-SIGN Act, 15 U.S.C. § 7001, an agreement in electronic form is valid and entitled to legal effect if certain conditions are met. Those conditions

include the disclosure in a clear and conspicuous statement setting out the consumer's right to receive records in paper form, the right and procedure to withdraw consent to electronic records, whether the consent applies to future records, and the hardware and software requirements necessary to access and retain records. 15 U.S.C. § 7001(c). Plaintiff contends that AHS has failed to show that the required conditions were met and, thus, the consent he purportedly gave by submitting a request for information is invalid as a matter of law.

The court concludes, however, that compliance with the E-SIGN Act is not required. This is because the plain text of the TCPA does not require a written agreement in order for a consumer's consent to receive texts to be valid. And since a written agreement is not required, neither is compliance with the E-SIGN Act.

With certain exceptions not relevant here, the TCPA generally prohibits companies such as AHS from sending text messages to consumers without the consumer's "prior express consent." 47 U.S.C. § 227(b)(1)(A). The regulation promulgated by the FCC in 2012 states that "prior express consent" means "prior express *written* consent" in the context of telemarketing and advertising texts. 47 C.F.R. § 64.1200(a)(2), (3) (italics added); *In the Matter of Rules and Reguls. Implementing the TCPA of 1991*, 27 FCC Rcd. 1830, 1831 (2012) (the 2012 Order). But that is not what the text of the statute says, and this court is not bound by the FCC's interpretation of the TCPA. *See McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.*, 606 U.S. 146, 149 (2025). Instead, the court is to "interpret the TCPA under ordinary principles of statutory interpretation, affording appropriate respect to the agency's interpretation." *Id.* at 152.

"The cardinal rule of statutory interpretation is that courts must first look to the language of the statute and assume that its plain meaning accurately expresses the legislative purpose." *United States v. Miscellaneous Firearms, Explosives, Destructive Devices & Ammunition*, 376

11

F.3d 709, 712 (7th Cir. 2004) (internal quotations omitted).  In determining whether the meaning of statutory language is plain or ambiguous, the court looks "to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997).  A court should not construe a statute "in a way that makes words or phrases meaningless, redundant, or superfluous." *Welsh v. Boy Scouts of Am.*, 993 F.2d 1267, 1272 (7th Cir. 1993).  Nor should the court add words to a statute.  *62 Cases, More or Less, Each Containing Six Jars of Jam v. United States*, 340 U.S. 593, 596 (1951) ("After all, Congress expresses its purpose by words.  It is for us to ascertain—neither to add nor to subtract, neither to delete nor to distort.").

In *Insurance Marketing Coalition Limited v. Federal Communications Commission*, the Eleventh Circuit vacated a more recent FCC regulation interpreting the phrase "prior express consent" as used in the TCPA to include two additional restrictions on the meaning of that phrase. 127 F.4th 303, 307 (11th Cir. 2025).  The regulation stated categorically that a consumer could not consent to a telemarketing or advertising text "unless (1) he consents to calls from only one entity at a time, and (2) he consents only to calls whose subject matter is 'logically and topically associated with the interaction that prompted the consent.'"  *Id.* (citing Second Report and Order, *In the Matter of Targeting and Eliminating Unlawful Text Messages, Rules & Reguls. Implementing the TCPA of 1991, Advanced Methods to Target & Eliminate Unlawful Robocalls*, 38 FCC Rcd. 12247, 12258–69 (2023) (the 2023 Order).  After careful review, the Eleventh Circuit concluded that "the FCC exceeded its statutory authority under the TCPA because the 2023 Order's new consent restrictions impermissibly conflict with the ordinary statutory meaning of 'prior express consent.'"  *Id.* at 307–08.  Although the validity of the 2012 Order requiring that

12

such "prior express consent" be in writing was not at issue in the case, the court's analysis is persuasive on the issue of whether that order is valid, as well.

In ruling that the 2023 Order conflicted with the ordinary statutory meaning of "prior express consent," the Eleventh Circuit began by noting "the TCPA requires only 'prior express consent'—not 'prior express consent' *plus*." *Id.* at 312. And while Congress gave the FCC the power to "prescribe regulations to implement the TCPA's prohibition on unconsented-to [texts]," the court explained that implement does not mean "to alter the specific choices Congress made." *Id.* "[A]n agency cannot 'decree[ ] a duty that the statute does not require and that the statute does not empower the [agency] to impose.'" *Id.* (quoting *Nat'l Ass'n of Broads. v. FCC*, 39 F.4th 817, 819 (D.C. Cir. 2022)).

Citing *Neder v. United States*, 527 U.S. 1, 21 (1999), the court then noted that "[w]here Congress uses terms that have accumulated settled meaning under . . . the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms." *Ins. Mktg. Coal. Ltd.*, 127 F.4th at 313. Because the TCPA did not otherwise dictate, the court concluded that it would use "common law principles to interpret whether a party [gives] . . . their 'prior express consent' to receive calls under the TCPA." *Id.* (quoting *Lucoff v. Navient Sols., LLC*, 981 F.3d 1299, 1304 (11th Cir. 2020)). Under the common law, the court continued:

> "the basic premise of consent is that it is given voluntarily." *Osorio* [*v. State Farm Bank*], 746 F.3d 1242, 1253 (11th Cir. 2014) (quotation omitted). "[C]onsent is a willingness for certain conduct to occur." *Lucoff*, 981 F.3d at 1304 (quoting *Schweitzer v. Comenity Bank*, 866 F.3d 1273, 1276 (11th Cir. 2017)). "[E]xpress consent," in turn, is "[c]onsent that is clearly and unmistakably stated." *Consent, Black's Law Dictionary* (12th ed. 2024); *see also Gorss Motels, Inc. v. Safemark Sys., LP*, 931 F.3d 1094, 1100 (11th Cir. 2019) (defining "express permission" in § 227(a)(5) to mean "permission that is clearly and unmistakably granted by actions or words, oral or written" (quotation omitted)). And "[t]he qualifier 'prior'

modifying 'express [consent]' means that the [called party] must have given his express [consent] before" he received the call. *Gorss Motels*, 931 F.3d at 1100.

*Id.*

Whether one looks to the plain ordinary meaning of the words or the common law definition of "prior express consent," the TCPA does not require a written agreement for a consumer to provide express consent to be contacted. *See Bradford v. Sovereign Pest Control of TX, Inc.*, 167 F.4th 809, 812 (5th Cir. 2026) ("The statute provides no basis for concluding that telemarketing calls require prior express written consent but not oral consent. *Contra* 47 C.F.R. § 64.1200(a)(2).").  A consumer who provides his contact information and clicks on the word "submit" on his computer screen, above which appears the message that, by doing so, "you consent to receive . . . text messages at the phone number you provided," is giving express consent to receiving such messages.  The court therefore rejects the FCC's interpretation requiring a written agreement.  If in fact Plaintiff completed the online form and submitted it to AHS, as AHS claims he did, his claim under the TCPA fails.

Notwithstanding the evidence suggesting that he did in fact provide such consent, Plaintiff denies that he completed the online form and submitted it to AHS.  He argues that his unequivocal denial creates a genuine dispute as to a material fact and that, therefore, summary judgment cannot be granted in favor of AHS.  His own testimony, together with the facts that the email submitted was incorrect; that, as a renter, he had no reason to purchase a home warranty; and that "lead fraud" is a known and recurring risk, Plaintiff contends, requires that AHS's motion be denied.

In arguing that summary judgment is appropriate even in the face of Plaintiff's denial that he submitted the online form, AHS relies heavily on *Johansen v. Efinancial LLC*, No. 2:20-CV-01351-DGE, 2022 WL 168170 (W.D. Wash. Jan. 18, 2022), in which the court granted the defendant's motion for summary judgment under similar circumstances.  In *Johansen*, the plaintiff

14

filed an action on behalf of himself and others similarly situated, alleging that the defendant company had violated the TCPA by placing telephone calls to him and the putative class members whose telephone numbers are on the National DNC Registry. *Id.* at *1. The plaintiff had previously filed approximately 60 TCPA lawsuits and had developed what one district judge characterized as an "extensive and profitable history with lawsuits involving TCPA claims." *Id.* at *4 n.1. His new claim consisted of two calls, only one of which could have subjected the defendant to liability under the TCPA. The defendant claimed it received a request for a life insurance quote through its website via the submission of an online form in which the plaintiff consented to be called. The plaintiff did not answer the first call but did answer the call on the following day and spoke with the defendant's representatives.

In granting the defendant's motion for summary judgment on the issue of consent despite the plaintiff's insistence that he had not submitted the internet request, the *Johansen* court noted that during the 26-minute conversation with the defendant's representatives after answering their telephone call, the plaintiff had initially expressed interest in $50,000 of life insurance coverage, answered detailed questions about his criminal and medical history, provided specific health information, did not object to the questions, and did not contend that the defendant lacked his consent to call him. It was only after the representative asked him for his driver's license number that the plaintiff began asking for the representative's name, telephone number, and the insurance company offering the quote. When he stated that his number was on the Do Not Call list, denied he had provided the defendant consent to call him, and asked how the defendant had acquired his contact information, the call ended and the defendant placed the plaintiff on the company's Do Not Call list. The court rejected the plaintiff's argument that his denial that he had requested a quote, that the submission included an incorrect birthday and email address, the fact that the IP

15

address associated with the submission was located in another state, and the possibility of overseas hackers or lead fraud was enough to preclude summary judgment in the defendant's favor. *Id.* at *3–5.

AHS argues that the same reasoning applies here and warrants granting summary judgment in its favor. It contends that Plaintiff's self-serving and conclusory testimony that he did not visit AHS's website and submit a request for more information about its products is not enough to create a genuine factual dispute that warrants a trial. This is especially true, AHS contends, in light of Plaintiff's efforts to resist discovery of his browser history and the forensic analysis performed on his computer showing deletions from the browser history at or around the time he visited an IT vendor and commenced the action.

But the fact that a party's own affidavit or deposition testimony submitted in opposition to a motion for summary judgment serves that party's own interests does not make it inadmissible or incredible. "After all, most affidavits submitted for these purposes are self-serving." *Payne v. Pauley*, 337 F.3d 767, 772 (7th Cir. 2003). It is only when self-serving affidavits "are not based on personal knowledge as required by both the Federal Rule of Civil Procedure on summary judgment, Rule 56(e) ('[s]upporting and opposing affidavits shall be made on personal knowledge'), and by Federal Rule of Evidence 602 ('A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.')," that they fail to preclude summary judgment. *Id.* Whether Plaintiff submitted his contact information and consented to receive text messages from AHS is a fact that would lie within his personal knowledge. And his specific and unequivocal testimony that he did not do so is not conclusory. "[T]he Seventh Circuit has repeatedly found that a nonmoving party's affidavit, declaration, or deposition testimony alone can defeat summary judgment." *Maxey v. Allstate Ins.*

*Co.*, No. 17 C 8392, 2020 WL 868532, at *6 (N.D. Ill. Feb. 21, 2020) (citing *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 894, 896 (7th Cir. 2018)).

AHS also compares its evidentiary showing to the video evidence addressed by the Court in *Scott v. Harris*, 550 U.S. 372 (2007). In *Scott*, the Court affirmed the grant of summary judgment even though the non-movant's version of the incident in question materially differed from the movant's version. A video recording, however, confirmed the movant's version of events. The Court held that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* at 380. AHS contends that the evidence in this case, though not a video recording, renders Plaintiff's version of the events, "so utterly discredited by the record that no reasonable jury could have believed him." *Id.*

AHS's argument is not entirely without merit. The fact that an online form with Plaintiff's name and contact information was submitted to AHS is difficult to explain if Plaintiff did not directly or indirectly submit it. That the email address was incorrect and the request was for information a renter would not be seeking is not surprising if the submission was not a good faith request for information. An accurate phone number would be enough to ensure the contact needed to claim a TCPA violation, and an incorrect email can both throw off suspicion and prevent unwanted emails. Plaintiff vaguely speculates about "lead fraud," but it is difficult to see how and why someone would submit Plaintiff's contact information to AHS without his consent, given AHS's policy of not making "cold calls" and the procedures it has adopted to ensure compliance with the TCPA. Plaintiff, on the other hand, has filed twelve previous TCPA complaints, all of which appeared to have resulted in settlements. Most companies, it seems, are reluctant to incur

17

the costs and attorneys' fees AHS no doubt incurred in actively pursuing its defense, instead of settling the case.  The questions that arise from Plaintiff's visit with the IT vendor shortly before filing his suit and AHS's forensic analysis of his computer showing possible deletions from his browsing history and visits to websites offering similar products provide additional weight to AHS's suggestion that Plaintiff manufactured his claim.

To be sure, AHS has submitted strong evidence from which a jury may conclude that Plaintiff did in fact provide the prior express consent to receive text messages that the TCPA requires.  But its evidence falls short of a video recording the contradicts the nonmovant's version of the events.  The Seventh Circuit has cautioned that *Scott* allows summary judgment, despite the nonmovant's disputed version of events only where video evidence provides irrefutable evidence of the movant's version of the facts.  *Gant v. Hartman*, 924 F.3d 445, 450 (7th Cir. 2019); *see also Eagan v. Dempsey*, 987 F.3d 667, 692 n.56 (7th Cir. 2021) (noting that the *Scott* exception is a narrow and pragmatic one reserved only in cases where there is clear and irrefutable video evidence).  This is not such a case.

A jury could view Plaintiff's thirteen filings in the last decade as indicating a strong distaste for being contacted without consent—a sentiment shared by Congress when it codified the TCPA, though, if true, it is hard to see why Plaintiff did not immediately opt out of AHS's communications.  Plaintiff nevertheless insists he did not submit the online form requesting information from AHS, and the forensic analysis AHS had performed on his computer failed to reveal evidence that he in fact did visit AHS's website.  This is enough to create a genuine factual dispute sufficient to preclude summary judgment in AHS's favor.  *See Clotz v. Fed. Sav. Bank*, No. 22 CV 3755, 2024 WL 6867421, at *3 (N.D. Ill. Feb. 21, 2024) ("In this case, although there is no dispute that Clotz's IP address was used to access FedRateWatch.com, there is sufficient

evidence—in light of Clotz's denial and his browsing history—for a reasonable jury to conclude that Clotz did not visit the website himself, and therefore did not consent to his information being used. Clotz's deposition testimony that he never visited the website is sufficient on its own to create an issue of material fact."). AHS's motion for summary judgment on the ground that Plaintiff provided prior express consent to receive text messages from AHS is therefore denied.

## B. Safe Harbor

AHS argues in the alternative that it is entitled to summary judgment under the safe harbor provision of the TCPA. The TCPA states "[i]t shall be an affirmative defense in any action brought under this paragraph that the defendant has established and implemented, with due care, reasonable practices and procedures to effectively prevent telephone solicitations in violation of the regulations prescribed under this subsection." 47 U.S.C. § 227(c)(5). According to the regulation implementing the safe harbor provision, a would-be violator can avoid liability if it can demonstrate that the violation is the result of error and that as part of its routine business practice, it implemented various procedures to avoid such errors. 47 C.F.R. § 64.1200(c)(2)(i). Those procedures include (1) "written procedures to comply with the national do-not-call rules;" (2) training of personnel on those procedures; (3) maintenance of a list of phone numbers that the entity cannot contact; (4) the use of "a process to prevent telephone solicitations to any telephone number on any list established pursuant to the do-not-call rules;" and (5) the use of "a process to ensure that it does not sell, rent, lease, purchase or use the national do-not-call database, or any part thereof, for any purpose except compliance with this section and any such state or federal law to prevent telephone solicitations to telephone numbers registered on the national database." § 64.1200(c)(2)(i)(A)–(E).

19

AHS contends that its routine business practice complies with these standards. As noted above, it has a written Telemarketing Do-Not-Call Policy that outlines procedures to comply with the National Do-Not-Call rules. The TCPA prohibits calls or texts to any consumer's telephone number listed in the DNC Registry unless that person gives prior express consent to receive such calls or texts. AHS's policy is to call or text only consumers who have given AHS such consent. Hoffman Decl., ¶¶ 5–6, Ex. A. It also maintains its own DNC list for persons who opt out and ask not to receive calls or texts, using a sophisticated software program to avoid mistakes. *Id.* ¶ 11. Its policy applies to all of its own employees, the employees of any subsidiary companies and any company with whom AHS contracts to provide teleservices. *Id.*, Ex. A. AHS also maintains a Training Manual that details its policy and provides "rigorous training" for all of its telemarketing personnel. Id. ¶ 13, Exs. B, C, & D. In addition to its own DNC list, AHS also subscribes to the federal and state DNC lists. *Id.* ¶¶ 15–16. Finally, "AHS does not sell, rent, lease, purchase, or use the National DNC Registry for any improper purpose." *Id.* ¶ 16. In light of these policies and procedures, AHS contends that if it failed to properly obtain Plaintiff's prior express consent, any such failure would have been an error. But because it meets the regulatory standards to guard against any such error, it is not liable under the TCPA.

Plaintiff challenges only AHS's use of the National DNC list. He argues that AHS failed to show that it used the DNC list to prevent illegal telephone solicitations. But the TCPA does not prohibit calls to consumers who consent to receive them, and AHS only made calls to persons it reasonably believed had given consent. AHS explains that it complies with the National DNC list by not conducting "cold calls to any individuals listed on the DNC list (or to any individuals at all, for that matter)." Reply Br. at 17–18, Dkt. No. 46. AHS nevertheless purchased access to the National DNC Registry from July 2024 through July 2025. Hoffman Decl., ¶ 16, Ex. F. This is

sufficient to demonstrate compliance with the regulatory standards. It is more than what the court found sufficient to demonstrate substantial compliance in *Johansen*. 2022 WL 168170, at *5. It thus follows that AHS is not liable and summary judgment should be granted.

## CONCLUSION

In sum, AHS is not entitled to summary judgment on the ground that Plaintiff gave prior express consent to receive its text messages. If, as AHS suggests, Plaintiff did provide such consent, and falsely claimed he did not, so he could pursue a claim against AHS, his conduct would be subject to sanctions, including payment of AHS's attorneys' fees and costs under Fed. R. Civ. P. 11(c)(4). But for the reasons set forth above, the court is unable to reach such a conclusion on summary judgment. Nevertheless, AHS has demonstrated that it has established and implemented reasonable practices and procedures to prevent violations of the TCPA. It thus follows that AHS is not liable for its error (assuming it was error) in believing it had Plaintiff's prior express consent to contact him. For this reason, AHS's motion for summary judgment (Dkt. No. 37) is **GRANTED**. The clerk is directed to enter judgment accordingly.

**SO ORDERED** at Green Bay, Wisconsin this 21st day of April, 2026.

William C. Griesbach
United States District Judge

21